That's our second case of the day. I picked up the wrong file. 4-18-0283 in re The Marriage of Yost. And for the appellant, Ruth Lyman. Yes, sir. And for the athlete, is it pronounced Baum? Bain. Bain. For the athlete, Ms. Bain. You may proceed. I would like to reserve five minutes for rebuttal, please. May it please the Court and Counsel. This is a case that involves primarily the issue of primary allocation of parenting time and decision-making in a divorce case with a very young child to turn four in about two weeks. But it also involves issues of domestic violence for which two orders of protection were filed by my client, Amanda Yost, the mother and respondent, and as well with regard to a petition for adjudication of indirect civil contempt with regard to the refusal by the petitioner, Jeremy Yost, to continue and to pay for the health insurance for my client, which was ordered in a temporary case. Now, with regard to the decision-making and with regard to parenting time, those factors, as the Court knows, involve very similar statutory factors to be considered when deciding this. And the trial court's ruling after hearing evidence was against the manifest weight of the evidence, and the evidence is clear and the opposite conclusion is clear from that. What we have is a more traditional family in that the mother, Amanda, was the primary caregiver for the young child, gave up employment to be able to care for the young child by agreement of the parties. Father, Jeremy, is a business person and has his own business, a business with his father, acquiring rental properties and acquiring various business interests and management for which he's required to go to meetings to Chicago, down to Carbondale, all around various parts of Illinois as part of his requirements and part of his job duties, as well as daily meetings and daily work in Charleston, where the parties reside. The history of this case and the history of the parties is where the parties agreed that mother would stay home with the child, and she did, and cared for the child and nurtured the child. She was training as a nurse and was able to not only care for and provide for the medical decisions and medical needs of the child, which luckily were not grave or were not anything sort of out of the ordinary of the normal issues that one has for an infant child, but also to be able to nurture him, take him to daily activities, play groups, make sure he learns adjustments to learning to share, learning to try new things, the sort of things that you want, one would want every child to be able to do. And while she did this on a daily basis, taking care of the child in the middle of the night when he would wake up, and then caring for him throughout the day while Jeremy was at work and at meetings, Amanda would take him to go explore and go to parks and learn about snakes and bugs. And in fact, the child, when he would see bugs or snakes, ran to his mother to show. And that's part of the evidence. He would always go when hurt, when injured, when he'd fall. When he wanted to show something new, it was the mother that he went to. Now, this is a two-year-old child when the custody or when Jeremy filed for divorce, so the expressions of the child weren't clear as I want to stay with mommy, I want to stay with daddy. But the evidence that was demonstrated clearly shows the wishes of the child to be more with the mother, as the mother would have been the primary caregiver by agreement of the parties. The child, Will, also had quite an adjustment, a strong adjustment to not only to Amanda, but to her family who lived up in the Chicago suburbs and where Amanda would take Will for weeks at a time in the summers to spend time not only with her parents and get to know his maternal grandparents, but also to be able to spend time and learn about new issues and new areas and explore new parks and arboretums and the other activities that were more prevalent in the suburbs. She was able to also make the arrangements for medical care for the child. Jeremy, while he testified that he always had a flexible schedule, he could go, he could change his schedule whenever he wanted, but the evidence showed, in fact, that the actions actually speak much louder than words. The child, when he was very young, but in the 24 months prior to Jeremy filing for divorce, had to get a special surgery down in St. Louis at Barnes, and Amanda scheduled that appointment, letting Jeremy know about that, but in fact, Jeremy, despite claiming that he has a flexible schedule, didn't appear at that surgery for his young son. The court found, contrary to the evidence, and from evidence, despite clear evidence, that showed that the parties cannot and should not be granted joint parenting, decision-making, and joint custody, that there should be. And part of the evidence that I think is strong in this area is also the fact that not only had the parties agreed that Amanda would make the decisions and that Amanda would be the primary caregiver for the party's child, she worked outside the home less than six months when Will was one year old, so about when he was, for six months, starting end of December of 15 to the beginning of June of 16, and that was part-time. During that time, Jeremy didn't take on extra responsibilities to care for the child. The child was in daycare or with babysitters, so it's not that Jeremy suddenly stepped up to the plate, and in fact, the parties then agreed after those less than six months, that trial time, that that didn't work, and Amanda should quit her job, as she did, to continue to be the primary caregiver, not just for Will, but then Jeremy's other child from another relationship would spend the summer with Jeremy and Amanda and Will, and Amanda, as Jeremy's ex-wife testified, was then the primary caregiver for the child. That history of being the primary caregiver and Jeremy coming home perhaps for lunch, as the evidence showed, does not suggest or evidence that Jeremy was a joint caregiver. Now, there was a temporary agreed order that was entered in September of 2016 by agreement of the parties, because Jeremy, as testified by Amanda, would not agree to allow her to spend any time with her son, would not allow any time until there was an order entered. So, an agreed order was entered providing for equal parenting time and equal decision-making or joint decision-making. What happens then, when you know you're going to be going to trial, when you know you're under the strict scrutiny of the court, what does Jeremy do? Jeremy refuses to answer questions when Will shows up at Amanda's house for an exchange, when he has a rash that shows that this child has needed a diaper change for several hours and has not been changed. Jeremy refuses to answer those questions. What happened? When did he last get his diaper changed? Another example, when Will was sick and Amanda took Will to the doctor, this was as he's just turned three years old, and then Jeremy's posting on Facebook as Will is having a temperature and was under doctor's orders to be, to not be outside the home. Jeremy has taken Will to a fall festival, posted on his Facebook page all of these things. On a temporary basis for all of these decision-making. One of the decisions, and one of the really contentious issues in the trial court, was the fact that Jeremy and Amanda had agreed that Jeremy's sister Heather should not spend any time with the child, and should not pick up the child from the child's daycare because of her erratic, and I think as Jeremy had phrased it, crazy, how crazy she was. The parties had agreed to this, had put Heather on a no contact list, and had ordered her, and had told the preschool that Heather under no circumstances was to be able to pick up the child. Jeremy had told several other individuals who testified in court about how quote unquote crazy his sister was, and in fact for two years Jeremy had refused to allow Heather and her brother Tony to spend time with Will, and had kept them away. But in fact, despite this joint parenting requirement, what Jeremy did is simply signed a statement with the preschool saying, oh it's okay for Heather to pick up. Now how did we find out about this? It wasn't from any disclosure. It wasn't from any statement that Jeremy testified to. By chance, on cross-examination under one of the last days, Jeremy admitted that oh, yes in fact he had signed this agreement, and admitted under cross-examination that he hadn't bothered to tell Amanda that he had changed this agreement unilaterally. Now while you are in a joint parenting or temporary joint parenting time, and under the scrutiny of the court, because trial is to appear, you won't even acknowledge or follow a joint parenting order. How can one trust or believe that you'll actually follow a joint parenting agreement when the court isn't watching you, because the trial court's ruling has already been set in an idea of permanency? Let me ask you a question. Isn't it true, well let me put it this way, isn't there contrary evidence that was presented to the trial court about Jeremy's interaction with his child and Jeremy's role in helping raise the child during those first couple of years before there was ever a separation? Well, so in the first, it's a yes and no answer because the only evidence that was presented that showed that Jeremy had been involved was Jeremy claiming, oh I got up and I took care of Will and I interacted with him. Well isn't it also the case that the preschool teacher testified that she couldn't tell the difference as to who'd had Will the day before regarding his attitude, his happiness, his... That's certainly true, but that doesn't show the interactions, I don't believe that shows sort of the interactions of the parties. The preschool teacher who had, I think, been the preschool teacher for a few weeks, certainly did testify she couldn't tell if Amanda had had the child the night before or Jeremy had. But as far as witnesses and evidence presented, the only evidence that Jeremy presented with regard to his interactions with the child, that is, feeding the child, caring for the child, taking the child out, was by Heather and Tony, his sister and brother-in-law, who had been the preschool teacher. Who, he later admitted, had been prohibited from actually interacting with Will for this about two-year time period until after, I think until after the divorce was filed by Jeremy. So these are clearly biased individuals and then... Wait, wait, wait, wait. Isn't that for the trial court to determine? By the way, didn't the trial court essentially make the finding or comment that he thought both were excellent parents? He found that both parents, I don't know if he used the word excellent, but he certainly found that both parents were fit... Good. Far better than most of the people who litigate these issues before this court. That might be an unfair quote, yeah. So where did... What you're really suggesting to us on the manifest way of the evidence standard is that the trial court didn't understand the evidence, ignored the evidence, and didn't know what he was doing. I mean, because you're saying that all the evidence and the believability of it falls on one side, and which really what we're talking about is the standard of review. That's correct. And I think the opposite conclusion is clearly evident when you look at the evidence and the actions of Jeremy. Now, in any custody case, you're always going to find each parent saying, oh, I'm this great parent, I knew this stuff. And family members undoubtedly would say that, because if they didn't, you wouldn't call them to be these witnesses. That would be the case with every witness. We're not inexperienced in dissolution cases. I understand that, Your Honor. But the opposite conclusion is clearly evident from the evidence with regard to the parenting time, and the court chose to ignore the history and the decision by the parties that Amanda was and should be, by agreement of the parties, Will's primary caregiver. The fact that Jeremy, even in this temporary agreed, joint parenting order, ignored the requirements of this agreed order, and then simply chose to ignore the fact that when Heather and Tony testified that Jeremy was a joint caregiver and helped to care for Will, the fact that, well, for two years, those individuals hadn't spent any time with Will. And this is a child who was not even three years old at the time of the filing. So the opposite conclusion was clearly evident, both with regard to the responsibilities and decision-making, as well as with the amount of parenting time given that Amanda, and the evidence including from people who were not her employees, she didn't have any employees, and not family members, who would testify that it was Amanda who was the primary caregiver. She took Will out and did that. Now, this is a child almost four years old. This is for permanency of the next 14 years. And so the court's ruling in granting joint parenting and joint time and joint decision-making was against the manifest weight of the evidence, and the primary decision-making should be given to Amanda. Now, the other part that I think is important in this, with the decision-making, is the history of abuse. Now, the trial court found that there was two petitions for orders of protection. He denied those petitions. But the abuse and the history of abuse, perhaps not, well, certainly, no broken bones, but as the court knows under the Domestic Violence Act, the restraint that Jeremy put on Amanda, the refusal to allow her to leave when she was at that apartment complex, was the apartment complex that Jeremy runs and was trying to leave and he blocked her in, him restraining her, him grabbing her phone, those were all violations of the Domestic Violence Act and the court's ruling denying that, at least certainly the first order of protection was an abuse of discretion. Now, finally, there's the issue of the petition for contempt. And that, as noted in the, well, it's not the last issue, but another important issue, Jeremy was ordered on November 5th to continue health insurance for Amanda. He apparently knew there was this letter that had come out in June that was sent to his home that said, hey, we're canceling health insurance because of problems with the ACA, end of December. Jeremy apparently knew about this because he purchased health insurance for himself and for Will to start January 1st. Not only did he not purchase for Amanda, despite the court order, but he didn't tell Amanda. And so she incurred all of these bills that were testified to, but the court denied that, somehow claiming that there were not bills for uncovered care, despite the fact that Amanda had presented that. And that was, the court should have found Jeremy an indirect civil contempt and ordered him to pay all of those uncovered medical bills for which he incurred bills starting January 1st. Counsel, question. Assuming nonpayment of the insurance, what evidence do you have, petitioner, or what can you point to in the record that there's a loss, pecuniary loss to petitioner or advantage to respondent due to the lapsing coverage? Those, there were bills that were presented, I think in the amount of over $1,000 in the bill. And I don't know that I can point to that right now, but I know in the record there was the evidence of How did the court treat those bills? It ignored them. It found, I think, in the written ruling that's attached to the appendix, that there were not. But there clearly were, and there was testimony by Amanda, once we started in the January proceedings, because we were in December and then she didn't find out until January, about the losses that she had. And so there were, and the court, we would ask that on remand that the court find that he was in contempt and should be ordered to pay those bills and order him to pay those bills. The other issue, and that sort of goes to that, is we have severe, pretty strong differences in economic circumstances between the parties. Amanda, first, having given up her employment to be able to be the primary caregiver of the parties, has done, did not have any income, except for a few dollars. She did selling these internet jewelry, that sort of thing, but only a matter of a few dollars, I think, not even enough to make anything on a tax, tax forms. And then Jeremy, who had a business with his father, which was a non-marital asset of his and income from that, as well as his, the Yoast management, for which he receives and continues to receive substantial funds. The court, the court's denial of maintenance and the court's equal distribution of the assets and debts was. Debts were distributed? Well, he was, Jeremy was allocated the debts. There was a $22 million avid acres purchase, and so what the court did is order Jeremy to pay those, but in dividing these assets, a greater portion of the assets and funds should have been allocated to Amanda, given the stark difference in the economic circumstances and ability to earn income into the future of the two parties. And we would ask that the court reconsider, or the appellate court remand to the trial court that decision to deny maintenance, order maintenance pursuant to the statutes and the statutes and the calculations there, as well as to order the redistribution of the assets to allow for a greater distribution, as opposed to 50-50, of the assets that the court, that the trial court did. Thank you, counsel. You'll have some time on rebuttal. Ms. Boehm. Good morning. My name is Kaylee Boehm, and I represent Mr. Yoast in the incident appeal, and I thank you for your time this morning. As counsel stated, Your Honor, the vast, the biggest issue before the court is that of the parental allocation of, or the allocation of parental responsibilities, specifically being decision-making and parenting time. In this case, Your Honor, Your Honors, as Your Honor correctly noted, in this case, the evidence was not as counsel stated. The evidence was that prior, since the child had been born, he was two and a half years old at the time the divorce was filed. Mr. Yoast worked from home, began his work day around 4 a.m. each morning, stopped working for the morning when the child would arise, take care of the child until Mrs. Yoast arose for the day, and then would resume working while she cared for the child, had lunch with his family every single day, would work again while the child napped, and then would be done working for the day when the child arose from his nap around 3 p.m. to 4 p.m. on a daily basis. Those sporadic meetings that he had, he did testify to those, but that was not the vast majority of his working responsibilities. Further, it is very important to note on two of the issues, one of which being maintenance, and the second of which being parenting time and decision-making, that up until the summer of 2016, Mr. and Mrs. Yoast were both employed outside of the marital home. Mrs. Yoast has a nursing degree. She was employed working at the local hospital, and Mr. Yoast retained the same employment. The parties equally divided the daycare routine, who's picking up and at what time. The parties equally divided the medical decisions. It was pointed out in testimony that the original testimony of Mrs. Yoast was not correct, and Mr. Yoast had attended almost all of the medical appointments for the minor child prior to date. He had attended those appointments. There was one appointment in the St. Louis area that he didn't attend. It wasn't for a surgery, it was for a consultation. That is what the evidence showed. Other than that, the parties had equal time with their child, were both equally involved, providing daycare outside of working hours, paying the babysitter, setting them up so that they could enjoy time as husband and wife. That's what the evidence showed. Let me ask a question about the, I don't want to say dysfunctional family, but his breach of a relationship with brother and sister or sister and brother-in-law. Yes, sir. There was such a breach. Do you agree with that? Or a period of time when they weren't interacting with one another? I do agree with that, sir. There was a very short period of time after the child was born. And was there an assessment by both parents, or by your client at least, that it would be preferable that they not pick the child up from school or that sort of thing? There had been a written consent at the preschool that the sister of my client would not pick up the child. That changed at some point? Yes, sir. Prior to even filing for divorce, as Heather Valkenakis testified to, the sister of my client, she testified that earlier even in 2017, prior to the filings of any orders of protection, filed with the parties separated on an abrupt basis, that all of the family had reconvened. In fact, there was testimony that Heather, the sister, and Amanda, Mrs. Yost, had lunch together and had developed a friendship that they were trying to brew back up as well. And it had reconciled whatever had ailed the family those years prior. They had allowed the child to be around Heather on a together basis, on a family type of setting. There was testimony from Tony as well, which is Heather's husband, that the parties had enjoyed holidays at each other's homes, saw each other numerous times per week. And Mr. Yost only continued that after the parties separated. He continued to see them on a regular basis when he had parenting time with his son. Do you agree that his authorization about the preschool pickup and that sort of thing probably should have been communicated to his spouse or ex-spouse? I suppose Your Honor could see it that way. However... I'm asking whether you see it that way. Yes, sir. Under the temporary agreed order, there wasn't an obligation for them to talk about anybody picking up the minor child. They were both allowed under the agreed temporary order to send whomever to the preschool to pick up the minor child. There also, if you look at the pleadings history in this case, Your Honor, not one of the pleadings filed by Mrs. Yost asks for the court to restrict who's allowed to be around the minor child during their respective periods of parenting time. That issue didn't come out until the final trial. We operated under a temporary order. She had the opportunity to file two orders of protection, neither of which cite to this alleged danger that this sister-in-law posed to this minor child. In regards, Your Honor, then to the parenting time, that is supported by the evidence. It's supported by Mr. Yost's work schedule. It's supported by what the family operated under the nights leading up to or the months leading up to the final separation. There is case law that supports this as well in regards to decision-making being held joint. In Ray, Tate, Oliver B., which is a 2nd District 2016 case, in that case as well, the child was born out of wedlock. The child was very young at that time. The parties, although each requested sole decision-making, the trial court ultimately found that the parties, that the totality of the evidence was actually that they cooperated on most of the major issues. In regards to the minor child and had been able to work out parenting time scenarios that didn't coordinate with the previous court order without having to reconvene back to court. That's exactly what Mr. and Mrs. Yost both testified to. There was testimony that both of them had needed a change here or there in regards to parenting time that they were to accommodate. In fact, there was no police involvement from the time the parties separated after Mrs. Yost left the marital home through the time of trial. There was no petitions for contempt other than that of the medical insurance allegation. The parties overall were cooperating, were co-parenting time. They lived in the same community. The child was able to keep his same school, playmates, family connections, and medical providers all while operating under the same agreed temporary order. The parties made an agreement at the very end of September, less than one month after filing for divorce, that they would share equal time and that they would have joint decision-making. That is not supported by the arguments of Mrs. Yost in that it wasn't working prior and therefore isn't working now. In regards to parenting time, the case that is supported in my brief is the Engray to Marriage of Perez, which is a 3rd District 2015 case. In that case, it's very similar facts to what we have at issue here. Father testified he had a flexible schedule. He was a barber in the prison system. He said he always had that flexibility. Mother testified for the last two years she'd been a stay-at-home mom after a layoff. The court ultimately decided in that case that the parties should have equal parenting time as well and cited to the same factors that are relevant in the Yost case that the child was able to maintain these pillars of support that is provided, especially at such a tender age of age 3 years old, almost 4. We do not believe that the evidence that the trial court and decision of the trial court can be found to be against the manifest weight of the evidence on either of the two foregoing issues. In regards to the petition for an order of protection, as counsel stated, in order for this court to overrule the denial of both of those petitions for an order of protection, again, it has to be found to be against the manifest weight of the evidence. Were there two judges involved on those petitions? Yes, sir. Originally, there were. Mrs. Yost appeared on September 14, 2017 in front of the Honorable Judge Mitchell Schick. Mitchell Schick was ultimately substituted off of the instant case by a filing of Mrs. Yost after he denied both petitions for contempt, and then the case was assigned to Judge Glenn, who ultimately made the ruling in the trial court. On September 14, 2017, Mrs. Yost appeared, which was six days after any alleged abuse had happened to Mrs. Yost, when actually the evidence that was presented and which was supported by the testimony of the officer that had appeared on September 13th and he had spoken to the alleged witness at the incident on September 17th, he saw no physical contact between Mr. and Mrs. Yost. The officer said that on September 13th, when she appeared unannounced at the marital home after being gone a few days prior, that the parties interacted cordially. There was no yelling. There was no hostility. There was no physical aggression. The other witness that testified was Patrick Hood, who was a mutual friend of both of the parties, and he also stated the same thing. The orders of protection were properly denied, Your Honor, despite the allegations of Mrs. Yost. They were not supported by any of the other testimony, and Mr. Yost adamantly denied ever placing his hands on his wife on any of the alleged incidences. In regards to the petitions for contempt, that is... How about that? It's rather distasteful that she wouldn't be notified that she wasn't going to have insurance. The notice, Your Honor, that was provided to Mrs. Yost was provided to her prior to the parties even separating. As counsel introduced into evidence, and as she stated during her argument, the letter that was received from the medical insurance was dated June of 2007. Okay, so she got notice. Yes, sir. What should have been done? She had notice. What should have been done? Is there an obligation in the temporary agreement that insurance would be continued? Would be continued. And it's the position of the original petitioner, Mr. Yost, that he did continue the health insurance. He took no affirmative action to do anything to cancel the health insurance. Well, but when he renewed or obtained it for himself and the child, he didn't do anything for the other party that was the subject of the agreement. That's correct, sir. And the reason he testified that he did that is because the first day of trial was January 13th. Or maybe, excuse me, it may have been January 17th. So when he renewed that policy on January 1, he said, well, trial's in 17 days. So when we are presumably divorced, this was his testimony, then I wouldn't have that obligation anymore because I can't provide her medical insurance. Further, in regards to the other... He could pay for it. He might not provide it for her. I'm sorry, sir? He could pay for it. That might have been a thing that would be ordered by the court. That could have been ordered by the court. But I guess it wasn't. It was not, sir. And it is the position of Mr. Yost, he did continue the health insurance. And he took no affirmative action to cancel it. And he thought that she knew and that they were going into the trial. Further, in regards to this alleged petition for contempt, as Judge Glynn cited to you in his ruling, he said there was not proved any damages. The statements of counsel do not reflect what's in the record. There were some medical bills that were attached to the financial affidavit filed by Mrs. Yost. However, a vast majority of those were alleged expenses that were incurred while she had health insurance. And Mrs. Yost didn't have an explanation for that when we went to trial. Specifically, there are some... Did she testify that she had out-of-pocket loss due to the lapse of insurance? I believe the testimony was, Your Honor, that the statements were attached to her financial affidavit. But however you look at those statements, a lot of them are from September, October, November, and December of 2017 when she had health insurance coverage. Further, if you take a look at those alleged losses, a lot of them are from no-call, no-show appointments at the very actions of Mrs. Yost that were for counseling services. That's when she had health insurance. And that can't be derived as a result of any of the actions of Mr. Yost. And therefore, the petition for contempt was properly denied. In regards to maintenance, as this Court is aware, that is derived from Section 504 of the IMDMA, which gives this Court a vast number of factors to consider. Judge Glenn properly reviewed those factors, and his decision to deny maintenance cannot be found to be an abuse of discretion. In this case, as previously alluded to, Mrs. Yost has a nursing degree. She utilized that nursing degree up until 2016. She was employed before the parties were married. She testified that she is not required to return to school to get any more certifications or to be able to resume working in the nursing field. Mr. Yost, during the marriage, worked in the same job as they did when they got married, just as when Mrs. Yost did. She worked after the child was born, and only in the summer of 2016 did she become voluntarily unemployed. Further, the Court has to consider where the parties leave this marriage. As you can review from Judge Glenn's ruling, that Amanda was awarded over $169,000 as a part of her property distribution. She was awarded about $53,000 in debt, all of which she'll be able to presumably pay off with the distribution, the equalization payment, that Mr. Yost is required to pay her. Mr. Yost, on the other hand, was left with a vast majority of the debt, including mortgages on these real estate properties that the parties had recently purchased and had little to no equity. All of that was considered in the Court's ruling under 503, which is the Division of Assets and Debts, and under 504 in regards to maintenance. The denial of maintenance, Your Honor, should be upheld, and it cannot be found to be an abuse of discretion. In regards to, therefore, under 503, the Court properly considered and devised the assets and debts of the parties as I previously stated. That should be upheld as well. The standard of review on that is an abuse of discretion, and the Court's ruling is thorough. He provides both of them with personal property as well as the financials and the debts are all allocated. In summary, unless the Court has further questions for me, we would ask that you uphold the ruling of the trial court on all of the issues that are presented this morning on appeal. Thank you. First, with regard to the Court's questions on the petition for contempt for the non-renewal of the health insurance, this suggestion of the fact that Jeremy followed the Court's orders by not renewing Amanda's health insurance, but by complying with the Court's order that he maintain Will's health insurance, I'm not sure what language, there must be some, I can't, I can't fathom it, I can't fathom an understanding of it. As noted in Exhibit A of the, to the petition for contempt, which was included in the separate appendix of the appellant, Amanda texts Jeremy on Friday, January 5th, and she testified to this too as well in those proceedings, hey, Jeremy, could you add me back on the health insurance? The agreement was that you would keep me on it for the time being. His response on Sunday, January 7th, two days later, was, hey, I'll drop off Will to you at 4. He never responds to the text messages that Amanda asks about the health insurance, about what's going on, about any of those issues. And the suggestion by counsel that first he had no obligation to continue health insurance is belied by the Court's order, which counsel admits to from November 5th, that he was to continue to provide health insurance for his wife and for his child. That he provides it for his child, he followed that order. But that he refused to file, not only refused to provide it for his wife once health insurance ended, and that health insurance letter that Ms. Bain suggests was sent to the parties was addressed to Jeremy Yost, and was not addressed to Amanda as she was not the carrier of the health insurance. So to suggest, oh, well, Amanda knew that there wasn't going to be any health insurance after that, there's no evidence of that at all. The June 26, 2000 letter, 2017 letter, says to Jeremy R. Yost, and it provides that notice. What is the ongoing responsibility of petitioner as to insurance for his ex-spouse? The ongoing, once the permanent order was entered, would be to terminate because the temporary orders are terminated once a permanent order is entered. Okay. Then do you agree or disagree with Ms. Bain's statement that some of the bills that were attached as part of an exhibit were incurred in September, October, November, and December? There were. And there was insurance. I agree that there were bills, and why those weren't paid by insurance, I don't know, and maybe they had to be resubmitted. But I appreciate Ms. Bain admitting that it was just some. Not all of the bills that were attached. What were the bills that were accumulated that were incurred after January 1st? I'm sorry, I don't have those on hand to be able to show the court, but I believe the evidence showed and that Ms. Yost testified to incurring additional expenses that should have been covered by insurance, which is how she found out that there was no insurance, but wasn't. I'd like to address a couple other issues in just the few minutes I have. Ms. Bain references Enrique Oliver, the second district court, where the court orders joint parenting time. I would note that in that case, there was no history of joint parenting before. In this case, the immediate history, which is during that temporary, shows that Mr. Yost, that Jeremy, had in fact violated this order. And Ms. Bain suggests that with regard to, oh, that there was no filing, that Amanda never filed a petition asking that Heather not be allowed to pick up the child. Well, that's because the parties had already agreed to this, and so it was to continue. It had already been a note in the school. So there need not be a petition to say, can this continue, when the parties are ordered to jointly participate. A suggestion then that Amanda was under some obligation to file a motion or a petition to say, hey, I want to continue the agreement of the parties that Heather not be able to pick up the child doesn't make any sense under the agreed joint, under the temporary joint parenting order. Additionally, with regard to this violence issue and the suggestion that perhaps this was just really a Shangri-La relationship, and everyone was really just hugs and kisses after Amanda left and wouldn't stay the night after Jeremy attacked her at the apartment complex, where she was helping out to work and where he kept her. When she returned without the child, having left her son, their son, up in Chicago with her parents, in front of the police officer, Mr. Hale, she warned Jeremy, she told Jeremy, I told you, if you put your hands on me again, I would leave you. Jeremy's response? Silence. There was no denial that night that he hadn't put his hands on her or anything like that. It wasn't until after he had some time to think about it, I think the next day or sometime later, where now and in court testimony he denies it. Thank you, counsel. Thank you.